IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MARY JOHNSON

     v.

                          :   Civil Action No. DKC 09-0787

UNITED STATES OF AMERICA

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this action are three motions filed by Defendant and Counterclaim Plaintiff the United States of America:[1]  (1) a motion for summary judgment against Plaintiff and Counterclaim Defendant Mary Johnson (ECF No. 80), (2) a motion for summary judgment against Counterclaim Defendant Ford Johnson (ECF No. 81), and (3) a motion to strike expert reports and testimony of Leo Bruette (ECF No. 82).  Also

---

[1] This action was originally filed as a refund suit against the Internal Revenue Service ("IRS").  The parties subsequently agreed, however, that the IRS, unlike the United States, may not be sued *eo nomine*, *see Murphy v. IRS*, 493 F.3d 170, 173-74 (D.C.Cir. 2007), *cert. denied*, 553 U.S. 1004 (2008), and that suit must instead proceed against the United States.  Although the complaint did not expressly name the United States as a party, the refund suit against the IRS is nonetheless presumed to be one against the United States because the judgment sought "would expend itself on the public treasury."  *Dugan v. Rank*, 372 U.S. 609, 620 (1963); *see also Aviles v. Lutz*, 887 F.2d 1046, 1048 (10th Cir. 1989).  Thus, in all subsequent filings, the parties have listed the United States as Defendant and Counterclaim Plaintiff, and the Government has signed its submissions accordingly.  The clerk also updated the docket to reflect this change.

pending is a motion for "partial summary judgment" filed by Counter Defendant Ford Johnson. (ECF No. 93). The issues are fully briefed, and the court now rules pursuant to Local Rule 105.6, no hearing being deemed necessary. For the reasons that follow, the Government's motions for summary judgment will be granted, and Ford Johnson's motion will be denied. The motion to strike will be denied as moot.

## I.   Background

### A.   Factual Background

The following facts are either uncontroverted, taken in the light most favorable to Mary and Ford Johnson, or have been admitted by the Johnsons in their pleadings.[2]  The Johnsons are husband and wife. In 1969, Mr. Johnson began a non-profit organization named Koba Institute to perform various government contracts in conjunction with Koba Associates, another company that he owned and managed. Mrs. Johnson performed limited human resources duties for both organizations. When Koba Associates

---

[2] Statements in a party's pleadings are conclusively binding on that party. *Church v. Maryland*, 180 F.Supp.2d 708, 740 (D.Md. 2002), *aff'd*, 53 F.App'x 673 (4th Cir. 2002). Indeed, admissions in the pleadings "may support summary judgment against the party making such admissions," even if the party presents post-pleading evidence to contradict its pleadings. *See Bright v. QSP, Inc.*, 20 F.3d 1300, 1305 (4th Cir. 1994), *cert. denied*, 513 U.S. (1994); *Waterman v. Batton*, 294 F.Supp.2d 709, 715 n.11 (D.Md. 2003), *reversed on other grounds by* 393 F.3d 471 (4th Cir. 2005).

failed to pay its payroll taxes in the mid-1990s, the IRS assessed Mr. Johnson with trust fund recovery penalties pursuant to 26 U.S.C. § 6672.[3]  The outstanding payroll taxes, accompanied by the lien subsequently imposed on Mr. Johnson for the trust fund recovery penalties, ultimately led Mr. Johnson to close Koba Associates.[4]  The lien also severely damaged his ability to obtain credit for Koba Institute.

---

[3] Section 6672 provides as follows:

> Any person required to collect, truthfully account for, and pay over any tax imposed by this title [a "responsible person"] who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over.

When an employer withholds wages from its employees' pay to cover the employees' share of FICA taxes, the employer is deemed to hold those taxes "in trust for the United States." *Slodov v. United States*, 436 U.S. 238, 243 (1978).  Failure by the employer to pay those taxes to the government may subject taxpayers meeting the requirements of § 6672 to "a civil penalty equivalent to 100% of the taxes not . . . paid." *Id.* at 245. This penalty is, therefore, referred to as a "trust fund recovery penalty." *See Cheatle v. United States*, 589 F.Supp.2d 694, 699 (W.D.Va. 2008).

[4] When the IRS assessed trust fund recovery penalties against Mr. Johnson for the failure of Koba Associates to pay FICA taxes, it considered assessing the same penalties against Mrs. Johnson.  Following a brief investigation, however, it ultimately declined to do so.

These difficulties led Mr. Johnson to approach Mrs. Johnson about changing the ownership structure of Koba Institute. In 1998, Koba Institute became a for-profit corporation in Maryland, with Mrs. Johnson as its sole shareholder. Mr. Johnson served as the corporation's president and managed its affairs. Because Mrs. Johnson "was not encumbered by a lien," her status as the corporation's owner enabled Koba Institute to enter into leases and other contracts, as well as obtain lines of credit. (ECF No. 80-10, Ford Johnson Dep., at 42-43).

Mrs. Johnson appointed herself as "Chairperson" of the corporation's board of directors in 2001. (ECF No. 80-21). Koba Institute's bylaws mandate that the chairperson of the board "be elected President of the Institute." (ECF No. 80-20 ¶ 2.1). The bylaws describe the President's role as follows:

> The President [who] shall be chairperson of the Board of Directors . . . shall preside at all meetings of the Board and/or officers. [S]he shall review, approve and recommend to the Board all proposed projects and budgets on an annual basis. [S]he shall be authorized to execute . . . legal papers, documents and instruments on behalf of the Institute. [S]he shall have general authority to manage the business and affairs of the Institute on a day to day basis, subject to and in accordance with the directions of the Board of Directors.

(*Id.* ¶ 3.2). The bylaws also authorize board members to "approv[e] . . . proposed projects and budgets," "establish[] . . . banking relations including power to borrow money," and

4

"control and manage[] . . . property, including power to purchase, . . . and dispose of the same." (*Id.* ¶ 2.2). But because the Johnsons had agreed that Mrs. Johnson would be the primary caregiver of the couple's children, Mrs. Johnson "delegated" and "entrusted" her authority in the corporation to Mr. Johnson, and Mr. Johnson was appointed President of Koba Institute. (ECF No. 94-7, Mary Johnson Dep., at 16-17; ECF No. 80-12, Ford Johnson Dep., at 12).[5] Mrs. Johnson, in turn, served as the corporation's vice president.[6]

The same day that Mrs. Johnson appointed herself as board chairperson, Koba Institute's board of directors – comprised of the Johnsons and Vanessa Fogg, the corporate secretary – unanimously approved the following resolution:

> The present holders of the offices of President, Vice-President, Treasurer and Secretary are authorized to sign checks, drafts, instruments, . . . and . . . orders for the payment of money from [Koba Institute] accounts, to endorse checks, instruments, evidences of indebtedness and orders payable owned or held by [Koba Institute], and to . . . . sign any application, deposit agreement, signature card or other documentation required by the Bank [of America], with the following

---

[5] In this memorandum opinion, the page numbers cited in the text are the page numbers provided by the ECF system.

[6] Per the bylaws, the Vice President "shall act . . . with the same authority," as the President, subject to directions from the board, in case of the President's absence or disability. (ECF No. 80-20 ¶ 3.3).

limitation:   .  .  .   that   either   Ford   T.
Johnson,   Jr.   (President   of   the
Company/Treasurer)   or   Mary   L.   Fogg   Johnson
(Vice-President   of   the   Company/Chairperson)
may   act   alone   or   with   any   other   named
signatory   to   said   accounts   in   any
transactions   with   the   Bank;   however,   any
transactions . . .   which   are   not   signed   by
either   [of   them]   must   be   signed   by   at   least
two   of   the   following   people . . . .

(ECF No. 80-19, at 9).   Around this time, Koba Institute opened a payroll account with Bank of America and expressly noted on the account documentation that Mrs. Johnson had the power to "sign singularly" on that account.   (ECF No. 80-25, at 10).[7]

Having "delegated" her authority to Mr. Johnson, Mrs. Johnson's actual involvement at Koba Institute was quite limited.   (ECF No. 94-7, at 16-17).   Although she had an office at Koba Institute and received an annual salary ranging from approximately $100,000 to $193,000 from 2001 until 2004, as well as a corporate car and cell phone,[8] Mrs. Johnson only came to work once per month.   When she did so, she would approve any

---

[7] The record also indicates that Koba Institute opened several operating accounts between 2001 and 2005.   On each of those accounts, Mrs. Johnson was authorized to write checks and execute other bank documents.   (*See generally* ECF No. 80-25).

[8] During the same periods, Mr. Johnson received no direct salary from the corporation, instead having Koba Institute pay the rent for the couple's home.   In 2001, 2002, and 2004, these rent payments totaled between $40,000 and $50,000.   In 2003, however, Koba Institute did not make any rent payments on Mr. Johnson's behalf, and he received no compensation from the corporation.

board resolutions, such as ratification of Mr. Johnson's acts as President, or perform tasks in the human resources department.[9] Thus, while Mrs. Johnson "may have given an opinion" regarding hiring and firing, Mr. Johnson made the ultimate decisions regarding employment during this time.   (ECF No. 80-11, Mary Johnson Dep., at 4).   Indeed, because Mr. Johnson oversaw the corporation's day-to-day operations, other employees viewed him as "the one who decides everything" and went to Mr. Johnson – rather than Mrs. Johnson - with any questions that arose in the business, including questions about financial matters such as payroll taxes.  (ECF No. 94-14, Adam Sharif Dep., at 4).

When Mr. Johnson was out of the office, he left explicit instructions for Mrs. Johnson to follow about any actions that needed to be taken.   For instance, Mr. Johnson would leave written instructions for Mrs. Johnson to sign specific checks in his absence, just as he did for other employees who needed to sign checks while he was away.   Because of her limited involvement with the corporation's daily operations, Mrs.

---

[9] On occasion, Mrs. Johnson would also sign leases and lines of credit for the corporation as a guarantor.  Additionally, Mrs. Johnson made more than a dozen loans to Koba Institute between 2001 and 2003, after Mr. Johnson had informed her that the corporation needed more money to cover its operating expenses.  She did, however, permit Mr. Johnson to determine how those funds were used within the corporation.   The record indicates that all of these loans were subsequently repaid.

Johnson was unaware of "the background or the context" for these checks and thus did not feel comfortable signing any checks that Mr. Johnson had not authorized. (ECF No. 94-11, Ford. Johnson Supp. Dep., at 16).[10] Accordingly, from 2001 through 2004, she never attempted to write any checks that Mr. Johnson had not already approved.

Near the end of 2004, Mrs. Johnson received a notice from the IRS that Koba Institute had not paid its payroll taxes for several quarters during 2001, 2002, 2003, and 2004. Prior to that time, Mrs. Johnson was unaware that the corporation had failed to remit all payroll taxes to the IRS. Upon receipt of the notice, she had "a serious talk" with Mr. Johnson and "told him" that the situation was "unacceptable" and that Koba Institute had "to take steps to make sure it [did not] happen again." (ECF No. 94-7, at 18, 36). Mrs. Johnson then proceeded to "fire[] the finance director," who had been tasked with making payroll tax payments, and "directed Mr. Johnson to personally handle all future tax payments as of January 2005." (ECF No. 1, Compl., ¶ 16). She "required" Mr. Johnson to provide her with "visual proof" of all tax payments that Koba

---

[10] In fact, when an employee once asked for Mrs. Johnson to sign a check that Mr. Johnson had not approved, Mrs. Johnson "labored for several hours to contact [him] in Nigeria" because she "did not want to" issue the check without understanding "the context" for the check. (*Id.*).

Institute made.  (*Id.*).  Additionally, at least with regard to the payroll account, Mrs. Johnson no longer followed the corporation's internal procedure for check authorization.  That is, following her "serious talk" with Mr. Johnson, Mrs. Johnson did not require instruction from Mr. Johnson before writing checks from the payroll account.  (ECF No. 94-7, at 18-20).

Due to Mrs. Johnson's "revamped oversight of tax payments," Koba Institute began remitting its subsequent payroll taxes to the IRS in full and, generally, on time.  (ECF No. 1 ¶ 17).  The corporation did not, however, pay the outstanding payroll taxes for 2001 through 2004 in full, although it continued to pay other debts, such as employee wages.  Accordingly, following an investigation, the IRS assessed trust fund recovery penalties against Mr. Johnson and Mrs. Johnson pursuant to § 6672.  Mrs. Johnson subsequently paid $351 toward her assessment.

**B.   Procedural Background**

On March 30, 2009, Mrs. Johnson filed a suit in this court for a refund of the taxes she had paid, asserting that the IRS's § 6672 assessment against her was erroneous.  (ECF No. 1).  The Government answered the complaint and filed a counterclaim against both of the Johnsons in order to reduce its § 6672 assessments to judgment.  (ECF No. 12).  The Johnsons answered the counterclaim and asserted various affirmative defenses.  (ECF Nos. 17-18).

A scheduling order was then entered, and the parties began discovery. The parties requested numerous extensions to the discovery deadline, and various discovery disputes caused the discovery period to extend until mid-2011. During this time, the Government twice requested to file an amended answer and counterclaim against the Johnsons. The court granted these requests because the Johnsons had not opposed them.

Following an unsuccessful settlement conference between the parties in August 2011, the court set a briefing schedule. In accordance with that schedule, the Government filed separate motions for summary judgment against Mr. and Mrs. Johnson on October 3, 2011. (ECF Nos. 80-81).[11] The following day, the Government also filed a motion to strike the expert reports and testimony of Leo Bruette, an expert on whom the Government anticipated the Johnsons would rely in opposing summary judgment. (ECF No. 82).

On October 28, 2011, the Johnsons jointly opposed the Government's motion to strike (ECF No. 88), and the Government subsequently replied to their opposition (ECF No. 89). After receiving an extension of time to oppose the Government's summary judgment motions, the Johnsons filed their opposition

---

[11] Approximately two weeks later, the Government filed a motion for *nunc pro tunc* permission to file these summary judgment motions separately (ECF No. 85), and the court granted this request (ECF No. 86).

papers on November 28, 2011.  (ECF Nos. 92, 94).  Mr. Johnson
also moved for "partial summary judgment" against the Government
on the same day.  (ECF No. 93).  The Government timely responded
to each of these filings.  (ECF Nos. 96-98).

## II.  Standard of Review

A court may enter summary judgment only if there is no
genuine issue as to any material fact and the moving party is
entitled to judgment as a matter of law.  *See* Fed.R.Civ.P.
56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986);
*Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008).  Summary
judgment is inappropriate if any material factual issue "may
reasonably be resolved in favor of either party."  *Anderson v.
Liberty Lobby*, *Inc.*, 477 U.S. 242, 250 (1986); *JKC Holding Co.
LLC v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir.
2001).

"A party opposing a properly supported motion for summary
judgment 'may not rest upon the mere allegations or denials of
[his] pleadings,' but rather must 'set forth specific facts
showing that there is a genuine issue for trial.'"  *Bouchat v.
Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir.
2003) (quoting former Fed.R.Civ.P. 56(e)).  "A mere scintilla of
proof . . . will not suffice to prevent summary judgment."
*Peters v. Jenney*, 327 F.3d 307, 314 (4th Cir. 2003).  "If the
evidence is merely colorable, or is not significantly probative,

summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50. (citations omitted). At the same time, the court must construe the facts that are presented in the light most favorable to the party opposing the motion. *See Scott v. Harris*, 550 U.S. 372, 378 (2007); *Emmett,* 532 F.3d at 297.

When faced with cross-motions for summary judgment, as in this case, the court must consider "each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Rossignol v. Voorhaar,* 316 F.3d 516, 523 (4th Cir. 2003) (internal quotation marks omitted); *see also havePower, LLC v. Gen. Elec. Co.*, 256 F.Supp.2d 402, 406 (D.Md. 2003) (citing 10A Charles A. Wright and Arthur R. Miller, *Federal Practice & Procedure* § 2720 (3d ed. 1983)). The court reviews each motion under the familiar standard for summary judgment, *supra*. The court must deny both motions if it finds there is a genuine issue of material fact, "[b]ut if there is no genuine issue and one or the other party is entitled to prevail as a matter of law, the court will render judgment." 10A *Federal Practice & Procedure* § 2720.

## III. Analysis

The Government has filed summary judgment motions against Mr. Johnson and Mrs. Johnson individually, presenting its certificates of tax assessment for the quarters at issue to

establish their liability.[12]   The Government also contends that both Mr. and Mrs. Johnson were responsible persons at Koba Institute who willfully failed to submit outstanding payroll taxes to the IRS.   The Johnsons oppose these motions on different grounds.   Mr. Johnson, in both his opposition and cross-motion for summary judgment, contends only that procedural irregularities in the IRS's assessment and collection process render the assessment invalid.   Mrs. Johnson, however, focuses her arguments on the issue of liability under § 6672, asserting that she neither acted as a responsible person nor acted willfully in failing to pay the corporation's payroll taxes. She also contends that a finding of liability would essentially permit the Government to obtain a double recovery.   These arguments will be addressed in turn.

> **A.    The Government's Motion for Summary Judgment Against Mr. Johnson Will Be Granted, and His Cross-Motion Denied, Because the Assessment Against Him Is Valid**

Mr. Johnson appears to make two arguments when contending that the assessment against him is invalid.   First, he asserts

---

[12] The Government has moved for summary judgment against Mr. Johnson for the quarters ending December 31, 2001, September 30, 2002, March 31, 2003, June 30, 2003, June 30, 2004, and September 30, 2004.   (ECF No. 81-1, at 1-2).   The Government seeks summary judgment against Mary Johnson for the quarters ending December 31, 2001, September 30, 2002, March 31, 2003, June 30, 2003, June 30, 2004, September 30, 2004, and December 31, 2004.   (ECF Nos. 80, at 1-2, 80-1 at 13 n.8).

that the assessment was not made within the limitations period set forth in § 6672. Second, he suggests that the assessment is invalid because he did not receive an official post-assessment notice from the IRS. Both of these arguments are without merit and, as explained below, the certificates of assessment submitted by the Government are sufficient to demonstrate Mr. Johnson's liability.

## 1. The Tax Assessment Against Mr. Johnson Was Made Within the Limitations Period

Section 6672 requires the IRS to notify a taxpayer by mail or in person before assessing a trust fund recovery penalty. 26 U.S.C. § 6672(b)(1). Mailing of Form 1153, a letter that informs the taxpayer about the proposed penalty and how to dispute it, is sufficient to provide the notice required by § 6672(b)(1). *Mason v. Comm'r*, 132 T.C. 301, 322 (2009); *In re Chabrand*, 301 B.R. 468 (Bankr.S.D.Tex. 2003).[13]   Mr. Johnson acknowledges that the IRS mailed him this form on March 21, 2005, that he received the form shortly thereafter, and that he did not dispute the proposed assessment. (ECF No. 93-1, at 1). When a taxpayer does not dispute a proposed assessment, the IRS has ninety days from the day it mailed the initial notice to

---

[13] This notice must be mailed or delivered before expiration of the three-year limitations period set forth in 26 U.S.C. § 6501. Mr. Johnson has not argued that the tax assessments against him were untimely in this regard.

assess trust fund recovery penalties. 26 U.S.C. § 6672(b)(3)(A). Because he did not receive any additional correspondence about the penalties until 2007, Mr. Johnson contends that the assessment fell outside this ninety-day limitations period, which ended on June 19, 2005.

As an initial matter, Mr. Johnson incorrectly assumes that assessment could not occur unless and until he had received a formal notice from the IRS about official imposition of the trust fund recovery penalties. But the term "assessment" refers only to the IRS's "formal determination that a taxpayer owes it money," *Stevens v. United States*, 49 F.3d 331, 336 (7th Cir. 1995) (Posner, C.J.), and this process merely "requires that a notation or entry be made in the internal records of the IRS," *United States v. Berman*, 825 F.2d 1053, 1056 (6th Cir. 1987) (citing 26 U.S.C. § 6203). Formal notice from the IRS that a tax has officially been imposed is a post-assessment procedure. *See* 26 U.S.C. § 6303 (explaining that the IRS provides this notice "after the making of an assessment"); *Snyder v. IRS*, 337 B.R. 542, 547 (D.Md. 2005) (describing such notice as "post-assessment notice"). Thus, the appropriate date to consider when determining whether the IRS timely assessed a particular tax is the date on which the IRS formally decided to impose that

tax, which occurs when an assessment officer signs the "summary record." Treas. Reg. § 301.6203-1.[14]

The Government has submitted certified copies of the certificates of assessment ("Form 4340") for the quarters at issue to demonstrate that the IRS made this formal determination within the ninety-day window set forth in § 6672(b)(3)(A). Each Form 4340 contains a column labeled "Assessment Date (23C, RAC 006)," which refers to the date "on which the respective summary records . . . were signed by an assessment officer," *United States v. Posner*, 405 F.Supp. 934, 937 (D.Md. 1975). Listed under each column is the date of June 14, 2005, (*see* ECF No. 81-6, at 2, 7, 11, 16, 20, 25), a date within the ninety-day limitations period.

Generally, submission of Form 4340 "has been held to be presumptive proof of a valid assessment," *United States v. McCallum*, 970 F.2d 66, 71 (5th Cir. 1992); *Dallin* ex rel. *Estate of Young v. United States*, 62 Fed. Cl. 589, 601 (2004) (same), *appeal dismissed*, 124 F.App'x 660 (2005), and courts have relied on this presumption when a taxpayer has challenged the date of the assessment, *e.g.*, *United States v. Dixon*, 672 F.Supp. 503, 506 (M.D.Ala. 1987), *aff'd*, 849 F.2d 1478 (11th Cir. 1988)

---

[14] The IRS has historically documented the "summary record" on Form 23C. *Geiselman v. United States*, 961 F.2d 1, 5 (1st Cir. 1992), *cert. denied*, 506 U.S. 891 (1992).

(unpublished opinion).   "Only in rare cases" can a taxpayer overcome this presumption by demonstrating an irregularity in the IRS's assessment procedure.   *Curley v. United States*, 791 F.Supp. 52, 54 (E.D.N.Y. 1992); *Brewer v. United States*, 764 F.Supp. 309, 312 (S.D.N.Y. 1991).   Mr. Johnson contends that three irregularities exist in his case to "destroy[] the assessment's foundation" and prevent the court from relying on the assessment date set forth in the Forms 4340.   *Curley*, 791 F.Supp. at 54.   Mr. Johnson's argument, however, is ultimately long on rhetoric and short on evidence, as he fails to show that any such irregularity actually existed in the IRS's assessment procedure.

Mr. Johnson first asserts that the court may not rely upon the Forms 4340 because they were prepared outside of the limitations period.   (*See* ECF No. 81-6, at 5, 9, 14, 18, 23, 27) (noting that the forms were prepared in April 2011).   In support of this assertion, he relies on *Stallard v. United States*, 806 F.Supp. 152 (W.D.Tex. 1992), but this reliance is misplaced. Although the district court in *Stallard* stated that Form 4340 was not entitled to a presumption of validity where the IRS prepared it after the expiration of the statute of limitations, the United States Court of Appeals for the Fifth Circuit firmly rejected this conclusion on appeal.   *See Stallard v. United States*, 12 F.3d 489, 494 (5th Cir. 1994).   Other courts

17

considering the issue have unanimously agreed with the Fifth Circuit, rejecting any argument from taxpayers that a Form 4340 dated outside the limitations period somehow renders the assessment itself irregular. *See, e.g.*, *Hobbs v. Comm'r*, 32 F.3d 561 (1st Cir. 1994) (unpublished table opinion); *Crisp v. United States*, No. CIV-F-96-6308OWWSMS, 1999 WL 1101279, at *7 (E.D.Cal. Feb. 18, 1999) (further reasoning that a taxpayer had inappropriately relied on the district court's opinion in *Stallard* given the Fifth Circuit's subsequent decision), *aff'd*, 238 F.3d 428 (9th Cir. 2000). Mr. Johnson's argument to the contrary is, therefore, without merit.

Mr. Johnson next asserts that an irregularity exists in the IRS's assessment because his case file does not contain proof that the IRS mailed him copies of Form 2749 or Form 3552 (Parts 3 and 4). This argument fails on multiple fronts.[15] First, the

---

[15] Mr. Johnson's purported reliance on testimony from Suzanne Fawley, the IRS's designated witness, to support his argument regarding an untimely assessment is also misplaced. His bald assertion that Ms. Fawley "conceded in binding Rule 30(b)(6) testimony [that] proof of mailing or hand delivery of Parts 3 and 4 of Form 3552 is required to show compliance with the statute of limitations" grossly misstates the record and the law. (ECF No. 93-1, at 9). As an initial matter, Ms. Fawley made no such statement during her deposition. Additionally, Mr. Johnson's distorted interpretation of her testimony again misunderstands the distinction between the assessment process itself and post-assessment notice. *See, e.g.*, *Petrie v. Comm'r*, 686 F.Supp. 1407, 1409 (D.Nev. 1988) (noting that Form 3552 is a "Statement of Tax Due on Federal Tax Return" that is sent

section of the Internal Revenue Manual ("IRM") cited by Mr. Johnson as requiring the IRS to retain proof of mailing Form 2749 does not in fact impose such a requirement.  Indeed, while the IRM states that a completed case file assessing trust fund recovery penalties "will consist," *inter alia*, of Form 2749, nowhere does it state that the IRS must maintain proof that it has mailed this form to the taxpayer.  IRM § 5.7.6.4-1.  The absence of such language is particularly instructive because the IRM does mandate that the IRS maintain proof of mailing other documentation to the taxpayer.  *Id.*  Additionally, although the IRM requires the IRS to include proof of mailing Form 3552 (Parts 3 and 4) "if [those documents are] secured or prepared as part of the . . . investigation," *id.* § 5.7.6.4-2, there is no indication that such documentation was utilized in this case.[16]

More fundamentally, however, Mr. Johnson's argument fails because there is no support for his implicit assumption that a marginally incomplete case file renders an assessment irregular.

---

pursuant to § 6303, which requires notice to taxpayers "after the making of an assessment of a tax").

[16] The IRM states that these documents are part of the "Prompt Assessment Billing Assembly."  *Id.*  The record indicates, however, that the assessment against Mr. Johnson was a "quick" assessment (ECF No. 97-3), which is required when the assessment statute expires within thirty days, rather than a "prompt" assessment, which is employed "when collection appears to be at risk," IRM § 5.7.6.3.

The IRM "does not have the force and effect of law," *Curley*, 791 F.Supp. at 54, and its "[p]rocedures . . . are intended [only] to aid in the internal administration of the IRS; they do not confer rights on taxpayers," *In re Carlson*, 126 F.3d 915, 923 (7th Cir. 1997), *cert. denied*, 523 U.S. 1060 (1998); *Groder v. United States*, 816 F.2d 139, 142 (4th Cir. 1987) (same).   Thus, even if Mr. Johnson's case file lacked proof of mailing one document to the taxpayer, which may run contrary to certain IRM requirements, it is unlikely that the absence of such proof alone would render the entire assessment irregular and place the presumptive validity of the Forms 4340 in doubt.

Finally, Mr. Johnson contends that the lack of "post-assessment collection activity" on his account – compared with the IRS's numerous collection attempts on Mrs. Johnson's account – demonstrates that the assessment itself was untimely.   (ECF No. 93-1, at 9).   Mr. Johnson's own description of this argument, however, reveals its fatal flaw.   Collection procedures, which may involve liens and levies by the IRS, are distinct from the assessment process and only occur *after* assessment has taken place. *See Shaw v. United States*, 20 F.3d 182, 184 (5th Cir. 1994) ("[A]ssessment deals with the decision to impose tax liability while . . . collection activities involve[] . . . trying to collect the taxes owed."), *cert. denied*, 513 U.S. 1041 (1994); *Stewart v. United States*, 578

F.Supp.2d 30, 34 (D.D.C. 2008) (explaining that "an assessment or tax determination . . . is distinct from the act of 'collection' of taxes.").  Thus, the lack of collection efforts against Mr. Johnson does not implicate the validity of the assessment process itself.  Indeed, the absence of such efforts is likely explained by the fact that Mr. Johnson earns no direct salary and possesses no assets that the IRS can collect.  (*See* ECF No. 81-13, Ford Johnson Dep., at 134-35) (explaining that he "receive[s] no salary" and that the IRS had been unable to collect the trust fund recovery penalties related to Koba Associates because he had no assets).

For these reasons, Mr. Johnson's attempt to "destroy[] the assessment's foundation" by demonstrating irregularities in the IRS's assessment procedure wholly fails.  *Curley*, 791 F.Supp. at 54.  Accordingly, the Forms 4340 submitted by the Government are presumptively valid, *id.*, and the court may rely on their notation that the assessment occurred on June 14, 2005, in resolving Mr. Johnson's statute of limitations argument, *see Dixon*, 672 F.Supp. at 506.[17]  This date is within the ninety-day window following March 21, 2005, as mandated by § 6672(b)(3)(A).  The assessments against Mr. Johnson took place prior to the

---

[17] Other documentation submitted by the Government also indicates that June 14, 2005, was the date of assessment. (*See generally* ECF Nos. 81-8, 81-9).

expiration of this limitations period and were, therefore, timely.

> **2.    The Fact that Mr. Johnson Did Not Receive Formal Post-Assessment Notice from the IRS Does Not Impact the Assessment Against Him**

Although not explicit within Mr. Johnson's motion papers, he appears to suggest that the assessment against him is invalid because he did not receive formal notice from the IRS that the assessment had been imposed.  This argument is also meritless. Section 6303 of the Internal Revenue Code requires the IRS to give notice to taxpayers about an assessment "as soon as practicable, and within 60 days, after the making of an assessment."  Each Form 4340 states that the IRS sent "Statutory Notice[s] of Balance[s] Due" to Mr. Johnson on June 14, 2005, the same date it assessed the trust fund recovery penalties against him.  (*See* ECF No. 81-6, at 4, 8, 13, 17, 22, 26). Where Form 4340 contains a notation indicating that such notice was sent to the taxpayer, this notation controls for purposes of determining compliance with § 6303, even if the taxpayer presents evidence that he never received the notice.  *Hansen v. United States*, 7 F.3d 137, 138 (9th Cir. 1993).  Thus, the mere fact that Mr. Johnson did not receive post-assessment notice of the trust fund recovery penalties does not mean that the IRS did not send it.

Yet even if the IRS had failed to send such notice, it would have no bearing on the assessment against Mr. Johnson. "[F]ailure to give Section 6303(a) notice does not bar the government from bringing a civil action against a taxpayer to collect unpaid taxes," as it has done here, because "the complaint gives the taxpayer notice that the government is proceeding against his property." *McCallum*, 970 F.2d at 70; *Berman*, 825 F.2d at 1060 (same). A contrary "rule of law would serve only to provide a windfall to permit taxpayers to avoid paying valid assessments . . . because of an I.R.S. clerical error." *Blackston v. United States*, 778 F.Supp. 244, 247 (D.Md. 1991). Therefore, had the IRS neglected to send post-assessment notice to Mr. Johnson, the assessment against him would nonetheless remain valid. *See id.* (rejecting a taxpayer's request to declare an assessment invalid where the IRS failed to send the taxpayer post-assessment notice pursuant to § 6303).

### 3. Mr. Johnson Is Liable Under § 6672 for the Trust Fund Recovery Penalties Assessed by the IRS

Because Mr. Johnson did not demonstrate any procedural irregularities in his tax assessment, the Government established a *prima facie* case in support of his tax liability through submission of the Forms 4340 for the quarters at issue. *United States v. Pomponio*, 635 F.2d 293, 296 (4th Cir. 1980). The burden then shifted to Mr. Johnson to establish that this

assessment was erroneous by either contesting the amount of the assessment or his responsibility and/or willful failure to pay the taxes.  *Id.*  Mr. Johnson makes no such arguments here. Indeed, he asserts that the "only relevant issue regarding [his] alleged liability is whether the Government has timely and properly preserved its claim," (ECF No. 92, at 2), and, as previously explained, the assessment against Mr. Johnson was both timely and proper.  Therefore, per the Forms 4340, Mr. Johnson is liable under § 6672,[18] and the Government's motion for

---

[18] The uncontroverted evidence indicates that Mr. Johnson would have been unsuccessful in arguing that he was not a responsible person during the quarters at issue or that he did not willfully fail to remit payroll taxes to the IRS.  When determining whether a taxpayer is a responsible person under § 6672, the United States Court of Appeals for the Fourth Circuit has articulated a "non-exhaustive list of factors to consider," including

> whether the [taxpayer] (1) served as an officer or director of the company; (2) controlled the company's payroll; (3) determined which creditors to pay and when to pay them; (4) participated in the corporation's day-to-day management; (5) had the ability to hire and fire employees; and (6) possessed the power to write checks.

*Erwin v. United States*, 591 F.3d 313, 321 (4th Cir. 2010). During his IRS interview regarding liability for the trust fund recovery penalties at issue here, Mr. Johnson essentially conceded that his involvement in Koba Institute from 2001 through 2004 satisfied each of these factors. (*See* ECF No. 93-2, at 7-9).

Mr. Johnson would also be unable to show that he did not act willfully in failing to pay over the payroll taxes to the

summary judgment will be granted.    Mr. Johnson's cross-motion for summary judgment will be denied.

The Government has requested judgment in the amount of $240,071.12, the purported amount of Mr. Johnson's tax liability as of August 22, 2011, as well as interest that has since accrued.    In support of this request, the Government has submitted Mr. Johnson's tax transcripts as of August 22, 2011, which total $240,071.27, (*see* ECF No. 81-9), an amount immaterially different from the Government's request.    Mr. Johnson does not dispute the Government's requested judgment at any point in his opposition to the Government's motion for summary judgment or in his own cross-motion.    Accordingly, judgment will be granted in favor of the Government and against Mr. Johnson for $240,071.12, plus interest that has accrued since August 22, 2011 pursuant to 26 U.S.C. § 6601(a), *see United States v. Sarubin*, 507 F.3d 811, 815 (4th Cir. 2007) (holding that § 6601(a) requires a taxpayer to pay interest

---

IRS.    "A responsible person's intentional preference for creditors other than the United States establishes willfulness as a matter of law; such an intentional preference occurs when the responsible person knows of or recklessly disregards an unpaid deficiency."    *Erwin*, 591 F.3d at 325.    Mr. Johnson has admitted that was the case here, stating that the company "tried the best [it] could" to pay the outstanding taxes "with the cash flow [it] had," after learning about the first delinquency in "early 2001."    (*See* ECF No. 93-2, at 10-11, 18).    Despite this knowledge, however, Mr. Johnson also acknowledged that Koba Institute continued to pay – pursuant to his instructions – other non-tax bills during this time. (*Id*. at 11, 19).

accruing from the date that the tax was due and compounding until the date that the total tax obligation has been paid); *see also United States v. Vardoulakis*, No. WDQ-07-3341, 2011 WL 255810, at *3 (D.Md. Jan. 26, 2011) (permitting the Government to recover post-assessment interest pursuant to § 6601(a) even though the Forms 4340 did not set forth the amount of interest that had accrued but not been assessed).

### B. The Government's Motion for Summary Judgment Against Mrs. Johnson Will Be Granted Because She Fails to Create a Dispute of Material Fact Regarding Her Liability Under § 6672

The Government has submitted certified copies of the Forms 4340 to demonstrate Mrs. Johnson's liability for the quarters at issue. In so doing, it has established a *prima facie* case for tax liability under § 6672 and has shifted the burden to Mrs. Johnson to demonstrate that its assessment was erroneous. *Pomponio*, 635 F.2d at 296. Mrs. Johnson presents three arguments in response: (1) she was not a responsible person at Koba Institute during the period for which the IRS has assessed trust fund recovery penalties against her; (2) she did not act "willfully" in failing to remit outstanding payroll taxes to the Government; and (3) the Government's efforts to impose liability upon her would result in double recovery, which is contrary to "clear IRS policy" and "to the dictates of the law." (ECF No. 94-1, at 6).

### 1. Mrs. Johnson Was a Responsible Person at Koba Institute During the Quarters at Issue

"The term 'responsible person' is broad and may include many individuals connected with a corporation, and more than one individual may be the responsible person for an employer." *O'Connor v. United States*, 956 F.2d 48, 50 (4th Cir. 1992); *see also Caterino v. United States*, 794 F.2d 1, 5 (1st Cir. 1986) ("Courts have explicitly given the word 'responsible' a broad interpretation."). The "key element" for determining whether a taxpayer is a responsible person "is whether that person has the statutorily imposed duty to make the tax payments," *O'Connor*, 956 F.2d at 51, and this question is examined in light of the taxpayer's status and authority within the corporation, *Lyon v. United States*, 68 F.App'x 461, 467 (4th Cir. 2003); *see also Vinick v. Comm'r*, 110 F.3d 168, 172 (1st Cir. 1997) (reasoning that "responsibility is a matter of status, duty, and authority").

Because this analysis focuses "on substance rather than form," title alone does not render a taxpayer a responsible person. *O'Connor*, 956 F.2d at 51.

> [R]esponsibility[, however,] does not require knowledge that one has th[e] duty and authority [to withhold and pay taxes]. The crucial inquiry is whether the person had the 'effective power' to pay the taxes. . . . That another person in the company has been delegated the jobs of withholding and paying employees' taxes and generally

27

> paying creditors is beside [the] point.  The
> crucial inquiry is whether a party . . . by
> virtue of [her] position in (or vis-à-vis)
> the company *could* have had 'substantial'
> input into such decisions, had [s]he wished
> to exert [her] authority.

*Barnett v. IRS*, 988 F.2d 1449, 1455 (5th Cir. 1993) (emphasis added).  Thus, while a determination of responsibility is necessarily fact-based, summary judgment is nonetheless appropriate where, in the absence of genuine disputes of material fact, "it is clear as a matter of law" that the taxpayer satisfies this test and is a responsible person.  *Lyon*, 68 F.App'x at 467; *Erwin*, 591 F.3d at 320 (acknowledging that "countless courts have found responsibility [for purposes of § 6672] as a matter of law" because "extensive caselaw . . . narrowly constrains a factfinder's province in § 6672 cases" (quoting *Barnett*, 988 F.2d at 1454 & n.10)).

As noted with regard to Mr. Johnson, the Fourth Circuit's analysis of this "critical inquiry" is guided by a list of non-exclusive factors, *id.*, such as whether the taxpayer is an officer, whether she controls the corporation's day-to-day operations, whether she has check-signing authority that she employs, and whether she has the ability to hire and fire employees, *Erwin*, 591 F.3d at 321.  Mrs. Johnson asserts that § 6672 would be transformed into "a strict liability statute" if the court concluded that she was a responsible person because

she merely held a figurehead title in the corporation after "entrust[ing]" all authority to Mr. Johnson.  (ECF No. 94-1, at 18, 30).  In the end, this argument fails when considered in light of the uncontroverted facts in this case.

A critical examination of the factors outlined by the Fourth Circuit demonstrates that, based on the totality of the circumstances, Mrs. Johnson was a responsible person at Koba Institute during the relevant quarters even though her participation in the corporation's affairs was minimal.  While "a party cannot be presumed to be a responsible person merely from titular authority," *O'Connor*, 956 F.2d at 51, status as an officer or director is "nevertheless material" to this determination, *Teets v. United States*, 29 Fed. Cl. 697, 706 (1993), *aff'd*, 39 F.3d 1196 (Fed.Cir. 1994) (unpublished table opinion).  Indeed, "[a] person's corporate title 'often tells much about the individual's responsibility, authority, and power.'"  *Id.*  Here, Mrs. Johnson has served as chairperson of the board and Vice President of Koba Institute since early 2001, and she has also been the corporation's sole shareholder since 1998.  In return for serving in these positions, Mrs. Johnson received an annual salary that ranged from approximately $100,000 to $193,000 from 2001 through 2004, as well as multiple perquisites, and her salary dwarfed the compensation that Mr. Johnson received during this same period.  Thus, Mrs. Johnson's

"elevated status," when considered in light of her compensation package, has bearing in this analysis, even though this factor is not itself dispositive. *Sale v. United States*, 31 Fed. Cl. 726, 731 (1994) (reasoning, in the context of a responsibility determination, that "plaintiff's elevated status" as chairman of the board, president, treasurer, and majority shareholder, "was undeniable" and "of significant importance" when coupled with the fact that he was the highest paid employee at the company).

The remaining factors – which look principally to Mrs. Johnson's involvement in the corporation's financial affairs – will be evaluated together.  The corporation's bylaws, board resolutions, and banking agreements demonstrate that Mrs. Johnson "control[led] the corporation on paper." *Lyon*, 68 F.App'x at 468.  Indeed, those documents indicate that Mrs. Johnson, while serving as chairperson of the board, would also serve as president of the corporation, a role that included authority to manage Koba Institute's daily affairs and to execute checks and other legal documents on its behalf.  It is undisputed, however, that Mrs. Johnson "delegated" and "entrusted" this authority to Mr. Johnson, remaining only minimally involved in the corporation's affairs as board chairperson and vice president.  (ECF No. 94-7, at 16-17; ECF No. 80-12, at 12).

That a taxpayer's function in an enterprise "is unconnected
to financial decision making or tax matters is irrelevant where
that individual has the authority to pay or to order the payment
of delinquent taxes." *Purcell v. United States*, 1 F.3d 932, 937
(9th Cir. 1993). Delegation of such authority, therefore, does
not relieve a taxpayer of responsibility under § 6672. *Id.*;
*Erwin*, 591 F.3d at 322. A taxpayer may be a responsible person
if she "had the authority required to exercise significant
control over the corporation's financial affairs, regardless of
whether [s]he exercised such control in fact." *Purcell*, 1 F.3d
at 937 (concluding that a president and sole shareholder, who
was also an authorized signatory on the corporation's checking
account, was a responsible person even though he had fully
delegated all financial duties to another employee); *see also*
*Kinnie v. United States*, 994 F.2d 279, 284 (6th Cir. 1993) ("The
fact that [the taxpayer] did not always exercise his powers
during the quarters at issue does not absolve him of his
responsibility to see that the withholding taxes were paid over
to the government.").[19]   Thus, Mrs. Johnson remained a

---

[19] Mrs. Johnson asserts that a taxpayer's "scope of
authority" is not determinative of responsibility and that the
taxpayer must have "substantively engaged in [corporate]
functions on a regular basis to be responsible under Section
6672." (*See* ECF No. 94-1, at 17-19). This argument, however,
contradicts well-settled case law throughout the country that
has held to the contrary. *See, e.g.*, *United States v. Kim*, 111

responsible person despite delegating her authority to Mr. Johnson and permitting him to run the corporation's daily affairs.

Mrs. Johnson, however, asserts that any authority she held was merely technical in nature because the documents granting this authority were written either as a "formality" or to satisfy state law or licensing requirements. (ECF No. 94-1, at 8). When a taxpayer makes such a claim, she "retains the burden of showing 'that [her] actual authority was in reality more limited than technical authority[.]'" *Lyon*, 68 F.App'x at 468 (quoting *United States v. Landau*, 155 F.3d 93, 103 (2$^d$ Cir. 1998)). If she fails to show a genuine dispute of material fact on this issue, the court "may reasonably conclude that the documentary evidence of authority reflects the reality." *Id*. The parallels between this case and *Lyon* illustrate why Mrs. Johnson fails to make such a showing here.

In *Lyon*, the taxpayer held numerous corporate offices and was the corporation's sole director and shareholder. But despite this paper authority, the taxpayer "spent little time in

_____

F.3d 1351, 1363 (7th Cir. 1997) (finding that a corporate officer and shareholder was a responsible person even though he was "not . . . physically present for much of [the tax periods in question]"); *see also Lyon*, 68 F.App'x at 464-70 (holding a taxpayer liable under § 6672 even though he "spent little time in the business offices and devoted little time to corporate duties").

the business offices and devoted little time to corporate duties," only acting at the direction of his father, who did not hold a corporate position but nonetheless ran the enterprise. *Id.* at 464.   The father had asked the individual who previously held his son's position to resign after she insisted on paying the corporation's payroll taxes, and she agreed to do so.   When subsequent payroll taxes went unpaid, the Government sought to hold both the father and the son liable under § 6672.   Rejecting the father's assertions that his son "lacked authority over general decision-making and management of the corporation" because he only acted pursuant to his instructions, the Fourth Circuit directed the district court to enter summary judgment in the Government's favor.   *Id.* at 464, 470.   In so doing, the *Lyon* court looked to the bylaws that gave the son authority to supervise corporate affairs and reasoned that he had failed to offer any evidence that his father had – or could have – prevented him from remitting the payroll taxes.   The Fourth Circuit found instructive the fact that the previous individual had paid the taxes, which "indicate[d] that [the son] could have done so had he chosen."   *Id.* at 469.   Additionally, it noted that the father's request that this individual "step down because she insisted on paying the taxes [did] not indicate that she could have been forced to step down."   *Id.*

Here, during the quarters at issue, Mrs. Johnson held corporate positions that, by virtue of the corporation's bylaws and other corporate documents, gave her the technical authority to control the corporation. She delegated much of this authority to Mr. Johnson and generally only performed work for the corporation if he asked her to do so on the infrequent occasions that she came to the office. Yet, similar to the son in *Lyon*, Mrs. Johnson's minimal involvement in corporate affairs and assertions that Mr. Johnson exercised all authority fail to create a material dispute of fact regarding limitations on her actual authority. Indeed, Mrs. Johnson's actions immediately after learning of the tax delinquencies in December 2004 – a period that "cast[s] light on" her responsibility from 2001 through 2004, *Erwin*, 591 F.3d at 321 (quoting *Vinick v. Comm'r*, 205 F.3d 1, 11 n.8 (1st Cir. 2000)) - instead demonstrate that her actual authority was co-extensive with the technical authority she possessed.

Mrs. Johnson admits in her pleadings that she "fired the finance director," the employee tasked with making payroll tax payments, as soon as she discovered that Koba Institute had not remitted these taxes as required by law. (ECF No. 1 ¶ 16). She also "directed Mr. Johnson to personally handle all future tax payments as of January 2005" and "required" him to provide her with "visual proof" of all tax payments the corporation made.

(*Id.*).   These admissions – which are conclusively binding upon Mrs. Johnson – indicate that her status in the company during the quarters at issue would have enabled her to have "'substantial' input into [its financial] decisions [from 2001 through 2004], had [s]he wished to exert [her] authority." *Barnett*, 988 F.2d at 1455; *see also Erwin*, 591 F.3d at 321-23 (finding a corporate shareholder, officer, and director to be a responsible person and emphasizing that his takeover of the corporation's financial operations upon learning of tax deficiencies "establishe[d] his authority"); *Thomsen v. United States*, 887 F.2d 12, 16 (1st Cir. 1989) (holding a company treasurer who had no involvement in daily operations to be a responsible person because he had technical authority to issue checks in the company's name and demonstrated "actual authority" through "his decision to end operations" after learning of the company's financial difficulties).[20]

---

[20] Mrs. Johnson's execution of corporate leases and lines of credit as a guarantor for Koba Institute, as well as her frequent loans to the corporation, are also probative, although not determinative, of her responsibility. *See Erwin*, 591 F.3d at 322 (discussing a taxpayer's personal guarantees of corporate loans in determining his responsibility, but noting that this fact "[did] not alone establish" his status as a responsible person); *see also Denbo v. United States*, 988 F.2d 1029, 1032-33 (10th Cir. 1993) (finding a director and officer's participation in obtaining bank loans for the corporation, as well as his infusion of capital into the corporation, probative of his status as a responsible person).

The fact that, from 2001 through 2004, Mrs. Johnson
followed the corporation's internal policy and "did not want to"
write checks without knowing that Mr. Johnson had previously
approved them does not mandate a contrary conclusion. (ECF No.
94-11, at 12). Indeed, although she followed corporate
procedure without exception during that time, it is undisputed
that Mrs. Johnson ceased following this policy almost
immediately upon learning of the tax deficiencies. Following
her "revamped oversight of tax payments," Mrs. Johnson would
write checks from the payroll account without any instruction
from Mr. Johnson. (ECF No. 1 ¶ 17). Accordingly, the fact that
Mrs. Johnson previously chose not to write checks without Mr.
Johnson's approval does not mean that he could have prevented
her from doing so. *Erwin*, 591 F.3d at 321-23 (concluding that a
taxpayer who virtually never wrote checks demonstrated that he
would have "had the power to exercise check-writing authority
[for several years] had he chosen to do so," when he took
control of the corporation's financial affairs "as soon as" he
learned of tax deficiencies); *Lyon*, 68 F.App'x at 469 ("The fact
that [the taxpayer] chose not to exercise his legal authority is
not enough to show that he had no actual authority. . . . [He]
has not demonstrated that his father actually prevented him, or

that he could have prevented him, from paying the taxes if [he] had attempted to do so.").[21]  The undisputed facts thus indicate that the documentary evidence of Mrs. Johnson's authority reflects the authority she actually possessed.[22]

Mrs. Johnson contends that *Lyon* is distinguishable from the present action and that *O'Connor*, a case in which the Fourth Circuit concluded that a taxpayer with a mere "figurehead title" was not a responsible person, 956 F.3d at 51, controls.  Both of these arguments are without merit.  The principal distinction Mrs. Johnson emphasizes between her case and *Lyon* is that the taxpayer there had "*sole* legal authority" to manage the

---

[21]  Mrs. Johnson's assertion that she signed board resolutions authorizing numerous corporate actions "without discussion" when Mr. Johnson asked her to do so similarly fails to demonstrate that her actual authority was more limited than her technical authority.  (ECF No. 94-1, at 8).  Once again, the fact that Mrs. Johnson chose to approve these resolutions "without discussion" does not indicate that she could not have asked questions and ultimately refused to sign them if those questions went unanswered.  *See Lyon*, 68 F.App'x at 464, 468-69 (finding the son to be a responsible person despite his contention that he signed corporate documents without reading or reviewing them).  This conclusion is bolstered by Mr. Johnson's assertion that he would have answered any questions Mrs. Johnson posed if she had asked them.

[22]  These circumstances, coupled with Mrs. Johnson's delegation of authority to Mr. Johnson, thus distinguish Mrs. Johnson's case from *United States v. Rem*, a case in which the United States Court of Appeals for the Second Circuit reversed the district court's grant of summary judgment to the Government because material disputes of fact existed regarding a taxpayer's check-signing authority within the corporation.  *See* 38 F.3d 634, 644-45 (2[d] Cir. 1994).

corporation's financial affairs and that no other employee could have been held liable. (ECF No. 94-1, at 27).[23] That reasoning, however, overlooks the well-settled principle that "[m]ore than one person may be held responsible for a corporation's payroll taxes." *Erwin*, 591 F.3d at 320. The touchstone for a responsibility analysis is whether the taxpayer possesses "significant" authority over the corporation's financial affairs, *Purcell*, 1 F.3d at 937; *In re Cobb*, 431 B.R. 23, 36 (Bankr.E.D.Va. 2010), not whether she possesses "sole" authority, *Erwin*, 591 F.3d at 321; *cf. Barnett*, 988 F.2d at 1455 (reasoning that "multiple" taxpayers may be responsible persons within a given company).

Mrs. Johnson also emphasizes that the bylaws gave the son in *Lyon* authority to oversee corporate affairs, that he performed numerous financial duties within the corporation, and that he replaced an individual who had previously paid the company's payroll taxes. These facts, however, do not render *Lyon*'s reasoning inapplicable to this case; rather, they illustrate why *Lyon* is instructive in resolving the parties'

---

[23] To the extent Mrs. Johnson also intends to distinguish *Lyon* based on that taxpayer's ongoing knowledge of tax delinquencies, her argument misunderstands the role of such knowledge in a § 6672 analysis. *See Godfrey v. United States*, 748 F.2d 1568, 1576 (Fed.Cir. 1984) (explaining that knowledge of nonpayment is "irrelevant in considering the question of whether [a taxpayer] was a 'responsible person,'" but "may be relevant to the issue of willfulness").

arguments.    Indeed,  similar  to  *Lyon*,  the  bylaws  gave  Mrs.
Johnson  technical  authority  to  control  the  corporation;  she
merely  chose  to  delegate  this  authority  to  Mr.  Johnson.
Additionally,  the  *Lyon*  court  relied  on  the  son's  performance  of
financial  duties  and  the  function  of  the  individual  he  replaced
to  demonstrate  that  the  son  exercised  actual  authority  over
corporate  affairs  and  presumably  could  have  paid  the
corporation's  outstanding  payroll  taxes.    The  same  overarching
circumstances  are  present  in  this  case,  as  the  facts  indicate
that  Mrs.  Johnson  exerted  actual  authority  over  Koba  Institute's
financial  matters  and  that  Mr.  Johnson  could  not  have  stopped
her  from  doing  so.

    These  considerations  also  render  Mrs.  Johnson's  analogies
to  *O'Connor*  unpersuasive.    Although  Mrs.  Johnson  contends  that
her  "remote  role  as  an  absentee  owner  fits  the  'passive
investor'  profile  of  *O'Connor*,"  (ECF  No.  94-1,  at  28),  her
admissions  regarding  her  actions  upon  learning  of  the  tax
delinquencies  belie  this  assertion.    In  *O'Connor*,  the  taxpayer
merely  held  a  "figurehead  title"  to  protect  his  ownership  stake
in  the  company.    956  F.2d  at  51.    He  possessed  the  technical
authority  to  sign  checks,  but  the  facts  demonstrated  that  "he
never  exercised  this  power,"  nor  any  other  authority  over  the
corporation's  finances.    *Id.*    Additionally,  the  Fourth  Circuit
emphasized  that  the  taxpayer  "drew  no  salary  [and]  had  no  office

space at [the company]." *Id.* Here, not only did Mrs. Johnson receive a substantial salary and have an office at Koba Institute, she also possessed the power to exercise authority over corporate finances and did so immediately upon learning that the corporation failed to remit its payroll taxes. *See Kinnie*, 994 F.2d at 283-84 (rejecting the argument by a vice president and fifty percent corporate owner that he was a "mere passive investor" where he had authority to sign checks and forced the other owner to leave the corporation before shutting it down); *cf. Taylor v. IRS*, 69 F.3d 411, 416-17 (10th Cir. 1995) (finding that a corporate officer and director had the "effective power" to pay taxes because he was a signatory on numerous bank accounts and had demonstrated authority over corporate finances even though he generally only acted at the direction of the president).[24]

---

[24] Mrs. Johnson analogizes to two additional cases where district courts denied the Government's motions for summary judgment on the issue of responsibility, but neither case controls the outcome here. First, in *Dintelman v. United States*, No. 3:07CV00081 SWW, 2010 WL 78182 (E.D.Ark. Jan. 7, 2010), the court declined to enter summary judgment against a taxpayer where the extent of her technical authority was unclear and material factual disputes regarding her actual authority were abundant. A portion of *Dintelman* also appears to place the burden on the Government to demonstrate that the taxpayer's actual authority was more limited than her technical authority, *see* 2010 WL 78182, at *5 & n.5, which is contrary to the burden articulated by multiple circuit courts, including the Fourth Circuit.

In the end, Mrs. Johnson's assertion that § 6672 would become a "strict liability statute" if she is found to be a responsible person is unfounded.   The Fourth Circuit has cautioned courts to be mindful of the "practical realit[ies]" within the business enterprise and to avoid rulings that would have the effect of enveloping "within 'responsible person' all significant investors with [corporate] titles[.]"  *O'Connor*, 956 F.2d at 51-52.   The outcome of this case, however, will not produce such an effect.   The undisputed facts are that Mrs. Johnson held significant authority within the corporation and had the power to exercise it when she chose to do so, even though her involvement in corporate affairs was otherwise minimal.   "[C]asting a wide net of responsibility under § 6672

------

Second, in *Savona v. United States*, No. 06CV1365 IEG (WMC), 2007 WL 3034456 (S.D.Cal. Oct. 15, 2007), the court distinguished *Purcell* and declined to conclude, at the summary judgment phase, that a taxpayer was a responsible person where evidence indicated that the taxpayer lacked authority because another employee "was the only one [who] *could* make any decisions when it came to any kind of financial spending," *id.* at *7 (emphasis added).   Unlike the present case, however, *Savona* did not involve a taxpayer's delegation of her authority to another.   Additionally, while the evidence presented by Mrs. Johnson indicates that Mr. Johnson did exercise significant authority over the corporation's financial affairs, it does not show that Mrs. Johnson could not have done so.   Indeed, the evidence – even when viewed in the light most favorable to Mrs. Johnson – actually supports the contrary conclusion.   *See Kim*, 111 F.3d at 1362 ("[A]ll that is required [to be a responsible person] is that the individual could have impeded the flow of business to the extent necessary to prevent the corporation from squandering the taxes it withheld from its employees.").

serves the important prophylactic purpose of encouraging all those with authority to stay abreast of a company's tax withholding and payment obligations." *Fiataruolo v. United States*, 8 F.3d 930, 941 (2d Cir. 1993); *see also Barnett*, 988 F.2d at 1457 (reasoning that a high-level corporate officer's failure to monitor company finances not only constitutes a "bad business practice," but also could serve as the basis for liability under § 6672). Declaring Mrs. Johnson to be a responsible person will further that purpose.

The facts indicate that Mrs. Johnson possessed both technical and actual authority at Koba Institute after becoming board chairperson in 2001. Although she often chose not to exercise that authority, the law indicates that such a decision is insufficient to permit a taxpayer "to shirk [her] statutorily imposed duties to [the corporation], particularly where [s]he [has] obtained benefits exceeding $[6]50,000" from the corporation. *Lyon*, 68 F.App'x at 468. Accordingly, Mrs. Johnson was, as a matter of law, a responsible person at Koba Institute during the quarters at issue.

### 2. Mrs. Johnson Acted Willfully in Failing to Remit Outstanding Payroll Taxes to the IRS

The willfulness inquiry focuses on whether a taxpayer had "knowledge of nonpayment or reckless disregard of whether the payments were being made." *Erwin*, 591 F.3d at 325 (internal

quotation marks omitted).   Mrs. Johnson contends that she did not act willfully in failing to remit Koba Institute's delinquent payroll taxes because she did not learn about them until the IRS notified her about tax delinquencies in December 2004.   As support for this argument, she relies on *Lyon* and attempts to distinguish the Fourth Circuit's conclusion that the taxpayer there acted willfully because he had previously met with the IRS about the corporation's payroll tax problems and still failed to pay the taxes when they came due.

This argument, however, overlooks that a taxpayer may act willfully for purposes of § 6672 even though she does not learn about unpaid taxes until after the corporation has failed to pay them.   *See id.* at 326 ("Even assuming . . . that [the taxpayer] did not act willfully *prior* to learning of the full extent of the tax deficiencies . . . , his conduct *after* that point unquestionably evidences willfulness as a matter of law.").   Thus, "[w]hen a responsible person learns that withholding taxes have gone unpaid in past quarters for which he was responsible, he has a duty to use all current and future unencumbered funds available to the corporation to pay those back taxes."   *Id.; see also Kim*, 111 F.3d at 1357 ("Even if a 'responsible person' is unaware that withholding taxes have gone unpaid in *past* quarters, it is settled law that a responsible person who *becomes* aware that taxes have gone unpaid in past quarters in

43

which [s]he was also a responsible person, is under a duty to [pay them]."). If the taxpayer thereafter knowingly permits payments to be made to other creditors, a finding of willfulness is appropriate. *Id.*

The record demonstrates that Koba Institute continued to make payments to other creditors using unencumbered funds following Mrs. Johnson's receipt of the IRS notice in December 2004. Indeed, the Government has produced numerous salary checks that the corporation issued to Mrs. Johnson in early 2005, which Mrs. Johnson readily cashed. (*See* ECF Nos. 28-35); *see also Logal v. United States*, 195 F.3d 229, 232 (5th Cir. 1999) (explaining that funds used to pay employee wages are "not 'encumbered' under § 6672"). Yet it is undisputed that Mrs. Johnson, a responsible person, knew during this time that payroll taxes for numerous quarters from 2001 through 2004 remained unpaid. Accordingly, as a matter of law, she acted willfully in failing to remit the corporation's delinquent payroll taxes to the IRS. *See Erwin*, 591 F.3d at 326 (finding that the taxpayer willfully failed to remit past payroll taxes where the record showed that the corporation continued to pay its rent and food vendors after being advised of tax delinquencies).

44

**3.  Mrs. Johnson's Concerns Regarding Double Recovery Are Without Merit, and Judgment Will Be Entered Against Her**

Finally, in an argument outlined only in the introduction to her opposition, Mrs. Johnson asserts that entering judgment against her would result in double recovery for the Government, contrary to case law and IRS policy. She appears to base her argument on two concerns. First, she states that the Government will collect a significant portion of the trust fund taxes she owes through the offer in compromise that Koba Institute has negotiated with the IRS. Mr. Johnson raised a similar argument when the Government previously sought judgment against him for trust fund recovery penalties at Koba Associates, and it was soundly rejected. *See Johnson v. United States*, 203 F.Supp.2d 416, 425 (D.Md. 2002), *aff'd*, 50 F.App'x 113 (2002), *cert. denied*, 540 U.S. (2003). In that case, Mr. Johnson had expressed concern that the Government "might attempt to obtain some sort of double recovery from both Koba [Associates] and [him] in excess of the established amount of withholding taxes due." *Id.* After explaining that the Government may attempt to satisfy a debt for unpaid payroll taxes against the business or the taxpayer, the court explained that the IRS follows an "established administrative policy" of only collecting such tax delinquencies once. *Id.* "[T]he mere fact that the [Government] is attempting to secure a second source for payment of taxes

45

owed does not necessarily mean that it will attempt to exhaust both sources in excess of the debt." *Id.* at 425-26.   The court also reasoned that "any lingering concerns of double recovery" could be allayed "by a carefully drafted judgment order of the district court." *Id.* at 425.   Similar precautions can be taken here.

Second, Mrs. Johnson suggests that the Government might succeed in obtaining a "double recover[y]" because certain voluntary payments made by Koba Institute were not properly credited pursuant to its voluntary designations.   Mrs. Johnson does not develop this argument or cite any evidence to corroborate it, and the court has identified no such evidence in the parties' summary judgment materials that would support it. *See* FRCP 56(c)(3).   Accordingly, Mrs. Johnson's concerns about double recovery do not preclude the court from entering summary judgment against her.

The Government has requested judgment in the amount of $304,355.90, the purported amount of Mrs. Johnson's tax liability as of August 22, 2011, as well as interest thereafter accruing.   In support of this request, the Government has submitted Mrs. Johnson's tax transcripts as of August 22, 2011, which total $304,355.90.   (*See* ECF No. 80-9).   Accordingly, judgment will be granted in favor of the Government and against

Mrs. Johnson in this amount, plus interest that has accrued since August 22, 2011 pursuant to 26 U.S.C. § 6601(a).

### C.   The Government's Motion to Strike Will Be Denied as Moot

The Government has also moved to strike the expert reports of Leo Bruette and to exclude his testimony at trial. Anticipating that the Johnsons would "attempt to rely upon Bruette's reports to create a disputed issue of material fact foreclosing the entry of summary judgment" regarding the amount of the assessment and remaining damages, the Government contended that the reports did not satisfy the standards set forth in Federal Rule of Evidence 702.  (ECF No. 82-1, at 2 n.1).  The Johnsons jointly opposed this motion on October 4, 2011.  When they subsequently submitted their responses to the Government's summary judgment motions, however, they neither relied upon Bruette's reports nor produced any evidence to create an issue of material fact that would foreclose the entry of summary judgment and require a trial on any issue.[25] Accordingly, the Government's motion to strike will be denied as moot.

--------

[25] Indeed, the Johnsons' summary judgment papers make no reference at all to the motion to strike or to Bruette's reports or potential testimony.

**IV.  Conclusion**

For the foregoing reasons, the Government's motions for summary judgment will be granted, and Mr. Johnson's cross-motion will be denied.  The Government's motion to strike will be denied as moot.  A separate Order will follow.

```
                            _____
                                      /s/
                            DEBORAH K. CHASANOW
                            United States District Judge
```